**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| LARRY WILLIAMS, | ) |
| | ) |
| Plaintiff, | ) |
| | )    **Case No. 04 C 3902** |
| v. | ) |
| | )    **Magistrate Judge Ian H. Levin** |
| ROMAN, INC., an Illinois corporation, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendant Roman, Inc.'s ("Roman") motion for summary judgment in the cause. For the reasons set forth below, the Court grants Roman's motion.

## BACKGROUND FACTS

Plaintiff Larry Williams ("Williams") is a former Regional Sales Director who was employed by Roman from 1999 through 2003.[1] (Def.'s LR56.1(a)(3) St. ¶¶ 17, 24, Pl.'s LR56.1(b)(3)(B) St. ¶ 21.)

Roman is an Illinois corporation and is in the business of distributing giftware, collectibles and seasonal decorations. (Def.'s LR56.1(a)(3) St. ¶¶ 2, 4, Def.'s Mem. at 1.)

Ronald T. Jedlinski was Roman's President and owner at all times relevant to this lawsuit.

---

[1]Prior to working at Roman, Williams was employed as the President of Johns Company for twenty-six years, which was a manufacturer's representative for children's clothing. (Pl.'s LR56.1(b)(3)(B) St. ¶ 5.) Williams also served as the President of the Merchandise Mart Apparel Association from 1978 to 1980 and as the President of the Indiana Women's and Children's Association from 1982 to 1983. (*Id.* ¶¶ 4-5.) He was elected to serve eight terms as the President of the Apparel Center Tenants' Association between 1986 and 1995 and served as a Sales Representative for the Phillips Van Heusen Corporation from 1960 to 1966. (*Id.* ¶¶ 2-3.) Williams graduated from Lake Forest College in 1959 and attended graduate school for one year at DePaul University. (*Id.* ¶ 1.)

(Def.'s LR56.1(a)(3) St. ¶ 7.) Anthony R. Jedlinski, Ronald Jedlinski's brother, is Roman's Vice-President of Administration, who referred Williams to Michael A. Orloff, Jr. ("Orloff"), Roman's Senior Vice-President for Sales and Marketing, when Williams applied for a position with Roman.[2] (*Id.* ¶¶ 8-10, Def.'s Mem. at 1, Orloff Aff. ¶¶ 2, 3.)

In September of 1999, Orloff hired Williams, who was 62 years old, to fill the position of Regional Sales Director, which entailed the principal duties of increasing sales and managing sales representatives. (Def.'s LR56.1(a)(3) St. ¶¶ 11-12, 17, 24.) Scott Bryson ("Bryson"), Roman's Vice-President of Sales, was Williams's immediate supervisor.[3] (*Id.* ¶ 15.) Bryson reported to Orloff. (*Id.* ¶ 16.)

Bryson was responsible for reviewing Williams's performance while he worked at Roman. (Def.'s Ex. 5[4], Pl.'s Ex. A.) On Williams's first performance review for the year 2000, which he had fourteen months after he was hired by Roman, Bryson gave him a 2.9 rating. (Def.'s Ex. 5, 2000 Managers Confidential Employee Appraisal.) A rating of 2 on the review indicated, "SATISFACTORY But Needs Improvement" and a rating of 3 on the review indicated, "GOOD." (*Id.*) In Williams's 2000 performance review, Bryson *inter alia* stated: "Larry needs to show more initiative and help drive the business vs. just maintaining the business. He needs to be in the field more, and develop[] more customer relationships." (Def.'s Ex. 5, 2000 Managers Confidential Employee Appraisal.) Williams's discussed these statements in his 2000 performance review with

---

[2]Anthony Jedlinski is a good friend of Williams. (Def.'s LR56.1(a)(3) St. ¶ 9.)

[3]Orloff was Williams's supervisor prior to Bryson being promoted to Roman's Vice-President of Sales. (Orloff Dep. at 9:24-10:17.)

[4]It bears noting that Roman's appendix to its motion for summary judgment contains three exhibits labeled as number 5.

Bryson. (Pl.'s Resps. to Def.'s LR56.1(a)(3) St. ¶¶ 40, 55.)

On Williams's second performance review which was for the year 2001, he received a rating of 2.8. (Def.'s Ex. 5, 2001 Year End Confidential Appraisal.) In this performance review, Bryson *inter alia* stated: "Larry needs to show more initiative in managing/building his existing business and in searching out and developing new business . . . [He] need[s] . . . to '[d]rive' his region[']s business, seek out new propect[ive] accounts, and then hold people accountable to get the business." (*Id.*) Williams discussed his 2001 performance review with Bryson. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶¶ 44, 55.)

In July of 2002, Williams received a bi-annual performance review. (Pl.'s Ex. A, 2002 Employees Bi-Annual Confidential Appraisal.) While Williams's rating is not indicated on that review[5], Bryson *inter alia* noted that "Larry must show more initiative and creativity in building his business. He must proactively search out new business opportunities and encourage his rep[resentatives] to do the same. He must lead by example, including [taking] the time . . . to maximize his business." (*Id.*) Williams discussed this performance review with Bryson. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶ 55.)

In January of 2003, Williams had his fourth performance review. (Def.'s Ex. 5, Year End Confidential Appraisal, signed by Bryson on 1/3/03.) At that time, Williams received a rating of 2.2 on the review. (*Id.*) It bears noting that, at this point, for the first time, Williams received unsatisfactory ratings in three categories. (*Id.*) In Williams's 2003 performance review, Bryson

---

[5]The parties agree that Williams received a 2.7 rating on his July of 2002 performance review. (Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 13, Williams Aff. ¶ 11.) This rating, however, is not reflected in the record. (*See* Pl.'s Ex. A, 2002 Employees Bi-Annual Confidential Appraisal.)

*inter alia* stated: "Larry is having a difficult time implementing the tough direction with his rep[resentatives] that is necessary to turn sales around." (*Id.*) Bryson also indicated that Williams had been directed to replace two sales representatives in his territory, but had not done so.[6] (*Id.*) Bryson further stated that "Larry must improve his performance in his current position by taking control of issues and demonstrating leadership. If this does not happen the field sales portion of his region will continue to struggle and alternatives for building this business will need to be evaluated." (*Id.*) Bryson discussed these issues and performance review with Williams. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶¶ 47, 50, 53, 55.)

It bears noting that while Williams did not entirely agree with Bryson's criticisms regarding his performance, he testified that Bryson's criticisms were not unreasonable and Bryson was not unreasonable in terms of what he wanted from him. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶ 56, Williams Dep. at 35:8-35:15.) Williams further indicated that, in some instances, Bryson had some legitimate concerns about his performance. (Williams Dep. at 37:20-38:7.)

During Williams's employment with Roman, he opened only one new account of any significance for Roman. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶ 36.) The one account Williams opened resulted from a lead given to him. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶ 37.)

Williams received a merit based performance bonus each year that he was employed with Roman including a $1,300.00 bonus which was paid in 2003 for his performance in 2002. (Def.'s Resp. to Pl.'s LR56.1(b)(3)(B) St. ¶ 8.)

Besides Bryson's evaluations of Williams's job performance, Orloff was also familiar with

---

[6]Williams was given a lead for the replacement of one of the sales representatives; however, he testified that he could not find an adequate replacement. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶¶ 48-49.)

how Williams performed while working at Roman because he had an opportunity to observe Williams at trade shows and sales calls.[7]  (Def.'s LR56.1(a)(3) St. ¶ 58, Orloff Dep. at 10:23-11:11.)

In December of 2002, Roman made an announcement to its employees regarding its decline in sales.[8]  (Williams Aff. ¶ 12, Pl.'s Ex. B.)  In the past when Roman experienced a decline in sales, it cut its operating expenses which included reducing the number of its employees.[9] (Def.'s LR56.1(a)(3) St. ¶ 24.)

During part of 2001 and all of 2002, Roman operated with one less Regional Sales Director position in order to save the salary expense of one Regional Sales Director, who had retired on June 8, 2001. (Orloff Aff. ¶ 6.)

Because Roman's decline in sales appeared to have "bottomed out" by 2002, Orloff planned to fill the vacant Regional Sales Director position for 2003.  (Orloff Aff. ¶¶ 7-8.)  Orloff and Bryson sought out and ultimately offered Mike Streb ("Streb") the Regional Sales Director position because

---

[7]In May of 2002, Orloff accompanied Williams on a sales call to Family Christian Stores, which was one of Williams's accounts. (Orloff Aff. ¶ 20.) At that time, Orloff learned that Family Christian Stores was so dissatisfied with Roman's customer service that it was getting ready to close its account. (*Id.*) The parties, however, dispute whether Family Christian Store's dissatisfaction with Roman was the result of Williams's failure to direct that inventory be set aside based on the customer's order or pre-order estimates or the result of Roman's difficulty in shipping products to Family Christian Stores. (*See* Williams Aff. ¶ 13, Orloff Aff. ¶ 20.) Nevertheless, Family Christian Stores continued to do business with Roman after that time. (Williams Aff. ¶ 13.)

[8]In 1999 and early 2000, Roman lost substantial business due to sales representatives leaving the company and taking customers to their new employers.  (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶ 35.)

[9]Roman suffered a decline in sales during the years 1999 through 2003. (Def.'s LR56.1(a)(3) St. ¶ 23.) Specifically, sales revenues declined from $122,306,000 in 1999 to $81,305,000 in 2003. (*Id.*)  In response to declining sales revenues, Roman *inter alia* cut its operating expenses by reducing the number of its employees from 385 in 1999 to 262 in 2003. (*Id.* ¶ 24, Williams Dep. at 18:1-5.)

he had ten years of very strong experience in the gift and collectibles industry. (*Id.* ¶ 9.) Streb had also served on the Board of Directors of the National Association of Limited Edition Dealers with Orloff, and had held a national executive sales leadership position with Enesco, one of Roman's major competitors.[10] (*Id.*) Streb also held a similar position at the Bradford Exchange, one of Roman's customers. (*Id.*)

Streb accepted the offer for the Regional Sales Director position in late 2002 and began working at Roman on January 6, 2003. (Orloff Aff. ¶ 10.)

On February 18, 2003, Orloff sent Bryson and other department executives a memorandum entitled the Roman Contingency Plan.[11] (Pl.'s LR56.1(b)(3)(B) St. ¶ 16, Pl.'s Ex. B, Orloff Mem. of 2/18/03.) The purpose of the memorandum was to elicit cost-cutting input from department executives in three areas; namely, key account expense savings, departmental expenses and reduction in force ("RIF") recommendations. (Pl.'s Ex. B, Orloff Mem. of 2/18/03.) In the memorandum, Orloff stated "[o]ur strategy is to reduce program expenses as much as possible to minimize the cuts needed from salaried positions;" however, some expense reductions would come from RIF recommendations.[12] (*Id.*)

_____

[10]Bryson knew Streb because he had also worked Enesco. (Bryson Aff. ¶ 8.) He believed that Streb had "great connections" in Roman's industry that he could put to use at Roman. (*Id.*)

[11]Because it was clear to Orloff that Roman was going to experience a fifteen percent decline in sales, he developed a process of contingency planning which called for a reduction in expenses including payroll expenses. (Orloff Aff. ¶ 14.)

[12]The February 18, 2003 memorandum stated in pertinent part:

The last RIF focused on hourly employees. To accomplish our savings goal for 2003, we need to review eliminating lower performing management positions in addition to hourly positions. Eliminating higher salaried management positions will allow us to achieve our salary savings through a smaller group of people. The

(continued...)

Prior to the 2003 RIF, Orloff considered the recommendations of Roman's department executives and reviewed an impact analysis prepared by Roman's Human Relations Department. (Orloff Aff. ¶ 15.) The criteria that would be used by department executives in determining who would be included in the RIF were an employee's length of service with Roman and an employee's job performance rating.[13] (*Id.* ¶ 16.)

As of March 31, 2003, Roman employed the following five Regional Sales Directors who were responsible for five different geographical sales regions: Linda Lindgren (age 57), hired by Roman on April 24, 1995 (Region I); Streb (age 47), hired by Roman on January 6, 2003 (Region II); Gail Sadowski ("Sadowski") (age 37), hired by Roman on June 6, 1989 (Region III); Williams (age 65), hired by Roman on September 27, 1999 (Region IV); and Mark Holmen ("Holmen") (age 46), hired by Roman on October 7, 1985 and May 22, 2000 (Region V).[14] (Def.'s Ex. 2, Position Statement of Respondent, Roman, Inc. at 2, Def.'s LR56.1(a)(3) St. ¶ 24.) Orloff asked Bryson to review each of the Regional Sales Directors and make a recommendation as to whom should be

---

[12](...continued)
management responsibilities can then be redistributed to other managers in the company. (Pl.'s Ex. B, Orloff Mem. of 2/18/03.)

[13]The 2003 RIF eligibility criteria stated: "All non-warehouse employees working at the Addison site were eligible for inclusion in the Reduction In Force program. Persons selected for inclusion in the Reduction In Force program were selected based upon two criteria: (1) length of service with the company and (2) job performance rating." (Def.'s Ex. 5, Ex. A - Eligibility Criteria.)

[14]Holmen was initially hired by Roman on October 7, 1985, as its Director of Sales for its Western Region and Director of Special Markets. (Def.'s Ex. 2, Position Statement of Respondent, Roman, Inc. at 2 n.1.) He subsequently resigned in June of 1995 after having completing nearly ten years of service with Roman. (*Id.*) Holmen was rehired by Roman on May 22, 2000, as the Regional Sales Director for geographical sales Region V. (*Id.*)

It bears noting that Defendant's exhibits to its motion for summary judgment contain three exhibits labeled as number 2.

retained.  (Def.'s Mem. at 5.)

In reviewing the Regional Sales Directors, Bryson determined that the selection process came down to Streb and Williams because all of the other Regional Sales Directors had greater lengths of service with Roman[15] than both Streb and Williams and, moreover, they all had better performance ratings[16] than Williams. (Bryson Aff. ¶ 4.) Thus, Bryson was satisfied with retaining the Regional Sales Directors other than Streb and Williams because he believed they were "performing well, generating new business and pushing hard on their sales representatives." (*Id.* ¶ 5.)

In making his RIF recommendation, Bryson ignored the length of service criterion and compared Williams and Streb on the basis of performance and potential.  (Def.'s Mem. at 6.) Bryson determined that Williams should be included in the RIF because Williams had never performed well in the areas that Roman needed for rebuilding sales in 2003 and in subsequent years which included "initiative, new account and sales generation, and expansion of existing accounts." (Bryson Aff. ¶¶ 6, 11(d), 12.) Bryson indicated that he "sat with [Williams] at reviews in 2000, 2001 and 2002 and explained repeatedly that Roman needed initiative, more field work, new accounts, new sales and expanded sales from existing accounts." (*Id.* ¶ 7.) Thus, Williams was Bryson's lowest rated Regional Sales Director whose performance had not improved between the years 2000 and 2002. (*Id.*)

---

[15]Lindgren and Holmen had additional work experience in Roman's industry. (Def.'s LR56.1(a)(3) St. ¶ 24, Def.'s Ex., Position Statement of Respondent, Roman, Inc. at 2.)  For example, Lindgren had a total of about fourteen years of work experience in Roman's industry while Holmen had a total of about eighteen years of work experience in Roman's industry. (*Id.*)

[16]It bears noting that because Streb had not been with Roman for six months, he had not been given a formal performance review.  (Bryson Aff. ¶ 4.)

Bryson, on the other hand, believed that Streb should be retained by Roman given Streb's experience in Roman's industry, ability, and industry connections which were need to rebuild Roman's sales. (Bryson Aff. ¶ 8.) For example, in the first quarter of 2003, after attending trade shows[17] in January, Streb reported to Bryson that Roman could expect business from a large new account and new or expanded business from other accounts. (*Id.* ¶ 11(a)-(c).) Thus, Streb had initiated a contact with a company called Tractor Supply which had shown a strong interest in purchasing Roman's products.[18] (*Id.* ¶ 11(a).) Moreover, Streb had opened a new account named Fred's[19] and took the initiative of identifying the corporate (national) buyer for Roman's account with Eckerd.[20] (*Id.* ¶ 11(b) & (c).)

Orloff also selected Williams for inclusion in Roman's RIF because he believed that Williams never performed well in the critical elements of his position which included sales growth and managing his sales representatives. (Orloff Aff. ¶ 19.) Moreover, Orloff knew that Williams consistently had the lowest performance ratings of the Regional Sales Directors in the years 2000, 2001 and 2002. (*Id.*) Therefore, Orloff believed that Williams should be included in the RIF because

---

[17]In Roman's industry, "sales at trade shows which occur early in the year are barometers for what sales will be for the remainder of that year. Ordinarily, Roman writes 50% of its annual sales in the first quarter of the year." (Bryson Aff. ¶ 9.) In addition, "customers will express an intent to purchase and give estimates as to the level at which they will later issue purchase orders. These estimates are largely given in good faith and are relied upon by Roman for planning and forecasting." (*Id.* ¶ 10.)

[18]In 2003, Streb generated $283,174.00 in sales with Tractor Supply and, moreover, in 2004, the Tractor Supply account grew to $738,547.00 in sales. (Bryson Aff. ¶ 11(a).)

[19]In 2003, sales to Fred's totaled $19,600.00. (Bryson Aff. ¶ 11(b).)

[20]Sales with Eckerd Drugs grew from $6,400.00 in 2002 to $66,000.00 in 2003 after Streb expanded the account beyond the regional level to the national level by selling to Eckerd's national (corporate) buyer. (Bryson Aff. ¶ 11(c).)

he was not capable of improving his performance.[21]  (*Id.*)

Orloff, on the other hand, considered Streb's performance in terms of "initiative, drive, follow up, aggressiveness and use of . . . contacts" and found Streb to be "far superior" to that of Williams. (Orloff Aff. ¶ 21.) Orloff believed that Streb "fit the bill" in "talent and experience" that Roman needed in order to turn its sales around and move forward. (*Id.*) Orloff therefore chose to retain Streb rather than Williams.[22]  (*Id.*)

In April of 2003, Roman terminated Williams's employment.[23] (Pl.'s LR56.1(b)(3)(B) St. ¶ 21.) At the time of his termination, Roman gave Williams a separation agreement which *inter alia* included a clause releasing Roman from any age-based employment discrimination claims. (*Id.* ¶ 23.) Williams, however, did not sign the separation agreement.  (Williams Dep. at 40:13-22, 41:11-

---

[21]Orloff provided the following testimony regarding his reasons for including Williams in the 2003 RIF:

   Q.   For what reasons did you decide that Mr. Williams was going to be one of the RIF employees in 2003?

   A.   Because it was clear to us that the business was going to require a lot of new accounts, a lot of business-building programs. We were hurting for sales. When Larry was hired, he was hired in a year that represented our 37th consecutive year of sales growth. Larry had good administrative abilities and was a good man, and we felt that he could maintain a region.

        After some things happened, with the loss of Bethlehem Lights and the collectibles decline in 2000, we went from a maintenance need to I've got to go build a business, I've got to be a demand creator, I've got to go out there, get leads, close deals, make something happen, I've got to lean on the reps, I've got to make them work harder or make them work smarter because sales continued to erode. Larry did not demonstrate to me in the time period that he could do that, period. He's a good man. I hated RIF'ing him. (Orloff Dep. at 49:24-50:19.)

[22]Orloff stated, "Even if Streb were not in the picture, I would not have retained Williams.  He did not do his job as well as Roman needed it to be done."  (Orloff Aff. ¶ 22.)

[23]Roman eliminated three other positions under its 2003 RIF.  (Def.'s Ex. 5, Ex. B - Persons Selected and Not Selected by Age and Job Classification.)  These included an office administration position, a web developer position, and a staff accountant position. (*Id.*)

13.)

Williams subsequently instituted the subject lawsuit alleging that Roman terminated him from his position as Regional Sales Director on the basis of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621. (*See* Complt.)

## LEGAL STANDARDS

### I. SUMMARY JUDGMENT

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party has produced evidence to show that it is entitled to summary judgment, the party seeking to avoid such judgment must affirmatively demonstrate that a genuine issue of material fact remains for trial. *See LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 920 (7th Cir. 1997).

In deciding a motion for summary judgment, a court must "review the record in the light most favorable to the nonmoving party and . . . draw all reasonable inferences in that party's favor." *Vanasco v. National-Louis Univ.*, 137 F.3d 962, 964 (7th Cir. 1998). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, the nonmovant may not rest upon mere allegations, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See also LINC*, 129 F.3d at 920. A genuine issue of material fact is not shown by the mere existence of "some alleged factual dispute between the parties," *Anderson*, 477 U.S. at 247, or by "some metaphysical doubt as to the material facts."

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson*, 477 U.S. at 252.

This standard is applied with added rigor in employment discrimination cases, where issues of intent and credibility often dominate. *See Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1038 (7th Cir. 1993). "[S]ummary judgment is improper in a discrimination case where a material issue involves any weighing of conflicting indications of motive and intent." *Stumph v. Thomas & Skinner, Inc.*, 770 F.2d 93, 97 (7th Cir. 1985)(*citing Kephart v. Inst. of Gas Tech.*, 630 F.2d 1217, 1218 (7th Cir. 1980)). Finally, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Freeman v. Madison Metro. Sch. Dist.*, 231 F.3d 374, 379 (7th Cir. 2000)(*quoting Anderson*, 477 U.S. at 255).

## II.     AGE DISCRIMINATION IN EMPLOYMENT ACT

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). In order to succeed on a discrimination claim under the ADEA, a plaintiff must show that his termination or other adverse employment action would not have occurred "but for" his employer's motive to discriminate against him on the basis of his age. *Taylor v. Canteen Corp.,* 69 F.3d 773, 779 (7th Cir. 1995); *Gehring v. Case Corp.,* 43 F.3d 340, 344 (7th Cir. 1994)(the ultimate question in an age discrimination case is "whether the same events would have transpired if the employee had been younger than 40 and everything else had been the same"), *cert. denied,* 515 U.S. 1159, 115

S.Ct. 2612, 132 L.Ed.2d 855 (1995).

A plaintiff may prove unlawful discrimination by presenting direct evidence of an impermissible motive, or indirectly using the framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The *McDonnell Douglas* framework requires that the plaintiff first establish a *prima facie* case of discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 802. To establish a *prima facie* case of age discrimination under the indirect method, a plaintiff must show that: (1) he is a member of a protected class (age forty and over); (2) he was performing at a level that met his employer's legitimate expectations; (3) he was subject to an adverse employment action; and (4) he was treated differently than a similarly situated person outside the protected class. *Krchnavy v. Limagrain Genetics Corp.,* 294 F.3d 871, 875 (7th Cir. 2002)[24]; *Miller v. Borden, Inc.,* 168 F.3d 308, 313 (7th Cir. 1998). The fourth element of the *prima facie* case, however, is fashioned differently depending on the type of age discrimination alleged by a plaintiff. *Miller,* 168 F.3d at 313. For example, in those situations involving the "simple termination of a single employee, normally the employee must establish that the employer *sought a younger replacement* for him." *Id.* (*citing Gadsby v. Norwalk Furniture Corp.,* 71 F.3d 1324, 1331 (7th Cir. 1995)). (emphasis in original.)

"Because unlawful discrimination can occur in a variety of employment contexts, '[the Seventh Circuit] ha[s] adapted the requirements for making a *prima facie* case in special cases to reflect the reality of the workplace.'" *Krchnavy,* 294 F.3d at 875 (*quoting Michas v. Health Cost*

---

[24]In *Krchnavy,* forty-five employees were terminated under the VEGA project (i.e., a RIF) and, in one of the defendant's facilities (i.e., the Prescott facility), the plaintiff, who was 44 years old, was the only employee who was terminated while three other younger employees were retained. *Krchnavy,* 294 F.3d at 872-74. One of the younger retained employees absorbed part of the plaintiff's job responsibilities. *Id.* at 873.

*Controls of Ill., Inc.,* 209 F.3d 687, 693 (7th Cir. 2000)). For instance, in a traditional RIF case, "an employer permanently eliminates a position from the workplace." *Id.* (*citing Bellaver v. Quanex Corp.,* 200 F.3d 485, 494 (7th Cir. 2000)). Thus, "[b]ecause the employer has removed a position entirely, the position will never be refilled." *Michas,* 209 F.3d at 693. In this type of case, it would make "little sense to require a plaintiff to . . . demonstrate that the position . . . was filled by someone who is not a member of the protected class." *Id.* Rather, in this type of situation, the Seventh Circuit requires that "a plaintiff . . . demonstrate that other similarly situated employees who were not members of the protected class were treated more favorably." *Id.*

Next, "[b]ecause of the fear that employers might misuse the RIF description to recharacterize ordinary terminations as reductions in force when they terminate an individual with a unique job, [the Seventh Circuit] ha[s] [in particular circumstances] dispensed with the requirement that the plaintiff show 'similarly situated' employees who were treated more favorably." *Michas,* 209 F.3d at 693 (*citing Bellaver*, 200 F.3d at 495). Rather, "because the fired employee's duties are absorbed by other workers and the employee was 'replaced, not eliminated,' [the Seventh Circuit] only require[s] that a plaintiff demonstrate that his duties were absorbed by employees who were not members of the protected class." *Id.* Thus, when an employee's duties are "absorbed by other employees" instead of being eliminated, a plaintiff can establish the fourth prong of the *prima facie* case by "showing simply that the plaintiff was 'constructively replaced,' [or] in other words that his responsibilities were absorbed by employees not in the protected class."[25] *Ritter v. Hill 'N*

_____

[25]It bears noting that "[w]hen a terminated employee's duties were absorbed by other employees, rather than eliminated from the company altogether, [the Seventh Circuit] do[es] not require the former employee plaintiff to make out the prima facie case normally required for reduction in force cases." *Paluck v. Gooding Rubber Co.,* 221 F.3d 1003, 1012 n.5 (7th Cir.

(continued...)

14

*Dale Farm, Inc.,* 231 F.3d 1039, 1043 (7th Cir. 2000)(citations omitted); *Gadsby,* 71 F.3d at 1331

(a plaintiff needs to show only that his responsibilities were "absorbed by other [younger]

employees."). The Seventh Circuit has indicated that this type of situation is called a mini-RIF.[26]

*Ritter,* 231 F.3d at 1043*; see also Michas,* 209 F.3d at 693 (noting that in a mini-RIF, a single

employee is discharged, not replaced, and his responsibilities are absorbed or assumed by other

employees).

Once a plaintiff establishes a *prima facie* case of discrimination, the burden shifts to the

employer to articulate a legitimate, nondiscriminatory reason for its adverse employment decision.

*See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d

207 (1981); *McDonnell Douglas Corp.*, 411 U.S. at 802. If the employer provides a legitimate

reason for its employment decision, the burden shifts back to the plaintiff to present sufficient

evidence to show that the employer's proffered reason is merely a pretext for discrimination.

*Burdine*, 450 U.S. at 253; *McDonnell Douglas Corp.*, 411 U.S. at 802; *see also Jackson v. E.J.

Brach Corp.,* 176 F.3d 971, 983 (7th Cir. 1999)("If the employer demonstrates a legitimate,

---

[25](...continued)
2000). Thus, "[f]or purposes of deciding the proper prima facie case requirements to apply, [the
Seventh Circuit's] inquiry is dependent not on the number of employees terminated, but 'on
whether [the defendant-employer] still needed [the plaintiff-employee's] job responsibilities to
be performed.'" *Id.* (*quoting Michas,* 209 F.3d 694). Accordingly, "when a particular terminated
employee's duties still were performed by employees of the company, . . . the reduction in force
prima facie case standard is inappropriate even if the company terminated numerous other
employees." *Id.*

[26]The Seventh Circuit has explained that "'the inference of discrimination [in such cases]
is premised on some degree of fungibility between the [terminated employee's] job and the
younger employee's job.'" *Miller,* 168 F.3d at 313 (*quoting Gadsby,* 71 F.3d at 1331). "The
younger employees 'need not be outside the protected class, i.e., under the age of forty,' . . . but
they should be substantially – i.e., at least ten years – younger than the terminated employee." *Id.*
(citations omitted).

nondiscriminatory reason, the plaintiff . . . must show that the employer's reason is a pretext for discrimination by a preponderance of the evidence.")

"A plaintiff can establish pretext by showing either that a discriminatory reason more likely motivated the employer or that the employer's explanation is unworthy of credence." *Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 398 (7th Cir. 1997). "Pretext . . . means 'a lie, specifically a phony reason for some action.'" *Jackson*, 176 F.3d at 983 (*quoting Russell v. Acme-Evans Co.,* 51 F.3d 64, 68 (7th Cir. 1995)). To demonstrate pretext, a plaintiff must present evidence from which a court can infer that the employer "did not, at the time of his discharge, honestly believe the reason they gave for firing him." *Michas,* 209 F.3d at 695; *see also Wolf v. Buss (America) Inc.,* 77 F.3d 914, 919 (7th Cir. 1996)("the employee must show that the employer did not honestly believe in the reasons it gave for firing him.). Furthermore, in order to show pretext in a RIF case, a plaintiff must establish that an improper motive "tipped the balance" in favor of his discharge. *Testerman v. EDS Tech. Products Corp.,* 98 F.3d 297, 303-04 (7th Cir. 1996)(*citing Umpleby v. Potter & Brumfield, Inc.,* 69 F.3d 209, 213 (7th Cir. 1995)); *see also Paluck,* 221 F.3d at 1012 ("Pretext may be shown by demonstrating that the reduction in force was an excuse to get rid of workers belonging to the protected group."). The burden of persuasion remains at all times with the plaintiff. *Burdine,* 450 U.S. at 253; *see also Bellaver,* 200 F.3d at 493 ("the ultimate burden of persuading the trier of fact that discriminatory animus caused [his] dismissal rests at all times with the plaintiff.").

## ANALYSIS

Roman brings the subject motion for summary judgment averring that there are no genuine issues of material fact with regard to Williams's ADEA claim. (*See* Def.'s Mem. & Def.'s Reply.) Specifically, Roman avers that Williams cannot establish a *prima facie* case of age discrimination

because he was not meeting Roman's legitimate performance expectations and, moreover, Roman's Regional Sales Directors were not similarly situated to Williams because other than Streb they had higher performance ratings and longer employment service with Roman. (Def.'s Mem. at 8-9.) Thus, according to Roman, the undisputed evidence in the record and Williams's own admissions demonstrate that Streb by virtue of his greater experience in Roman's industry was better qualified to meet Roman's changed circumstances. (*Id.* at 9.) Therefore, Roman contends that in the three month time period Streb worked at Roman, he demonstrated to Bryson and Orloff that he possessed the requisite qualities needed to increase sales whereas Williams failed to demonstrate these qualities in his three and one-half year tenure at Roman.[27] (*Id.*)

Roman further avers that even assuming *arguendo* that Williams can establish a *prima facie* case of age discrimination, Roman has articulated a legitimate, non-discriminatory reason for terminating Williams. (Def.'s Mem. at 9-10.) Specifically, Roman asserts that it appropriately included Williams in its 2003 RIF because he consistently had the lowest performance rating of all the Regional Sales Directors in the years 2000, 2001 and 2002 and, moreover, Williams's deficiencies were in the critical elements of his job; namely, sales growth and managing his sales representatives. (*Id.* at 9.) Roman further contends that the evidence in the record and Williams's own admissions establish that Roman had legitimate, non-discriminatory reasons for instituting the 2003 RIF. (*Id.* at 10.) Thus, Roman avers that because it experienced significant losses in sales in 2000 and 2001 and again in the first quarter of 2003, it attempted to address these problems by cutting expenses in several ways which included reducing payroll expense through a RIF. (*Id.*)

---

[27]Roman also asserts that Streb was not similarly situated because he was better qualified. (Def.'s Mem. at 9.)

Roman next contends that Williams cannot show that its decision to terminate him was a pretext for age discrimination. (Def.'s Mem. at 10-11.) Specifically, Roman avers that the only reason advanced by Williams's to support his contention that the decision to include him in the RIF was motivated by unlawful age discrimination is that Streb, a younger employee, was retained while he was terminated. (*Id.* at 10.) Roman contends that there is no evidence in the record to show that Bryson's departure from the RIF criterion regarding length of service can itself conclusively establish that Roman's reasons for including Williams in the RIF were a pretext for discrimination because Roman has articulated a legitimate reason for the departure. (*Id.* at 11.) Thus, according to Roman, Bryson's decision to include Williams in the 2003 RIF was not driven by an age-related motivation, but rather was based on Williams's past performance as measured against Streb's greater qualifications, promise, and better performance which he demonstrated in the first quarter of 2003. (*Id.*) Roman therefore avers that there is no evidence in the record which establishes a nexus between Bryson and Orloff's decision to terminate Williams and Williams's age.[28] (*Id.*)

Williams, on the other hand, assets that he can establish a *prima facie* case of age discrimination because he was meeting Roman's legitimate performance expectations and Streb, a younger, less experienced Regional Sales Director, was retained while he was terminated. (Pl.'s Resp. at 5-6.) Initially, Williams contends that the precipitous drop in his performance review in January of 2003 was contrived and merely an attempt on Roman's part to create a paper trail to cover up his unlawful termination. (*Id.* at 5.) Thus, Williams avers that even assuming that his 2.2 rating on his January of 2003 performance review was legitimate, under Roman's rating system, an

---

[28]Roman avers that there is no evidence in the record that Williams can dispute regarding Bryson and Orloff's judgment that it was in the best long-term interest of Roman to retain Streb rather than Williams. (Def.'s Mem. at 11.)

aggregate score of 2 or more indicates that an employee's performance is satisfactory. (*Id.* at 6.) Moreover, according to Williams, Roman's suggestion that his performance was deficient is not credible because six months beforehand, he received an aggregate score of 2.7, without a single unsatisfactory rating. (*Id.*) Williams further contends that Streb, a younger, similarly situated employee was accorded more favorably treatment because Roman chose to retain Streb, who had only been with the company for three months while he had worked at Roman for three and one-half years.[29] (*Id.*)

Williams's next asserts that Roman has failed to demonstrate that its reasons for retaining Streb were legitimate and not a pretext for age discrimination. (Pl.'s Resp. at 6-10.) Williams first claims that Roman's negative performance review at the time of the RIF decision demonstrates that Roman's decision to terminate him was pretextual. (*Id.* at 7-8.) Thus, according to Williams, it was not until Roman made its announcement in December of 2002 regarding declining sales that he first experienced a precipitous decline in his performance review; therefore, the timing between the announcement of poor sales and Williams's last review demonstrates pretext. (*Id.* at 7.) Williams also contends that even if the timing alone does not establish pretext, the validity of the January of 2003 performance review is in question because Bryson was highly critical of the fact that Williams had "taken no action to date" in replacing two sales representatives which Williams avers was

---

[29]It bears noting, as stated, that Roman asserts that Williams must show that "a younger similarly situated employee was accorded better treatment." (Def.'s Reply at 6.) *See e.g., Patterson v. Avery Dennison Corp.,* 281 F.3d 676, 680 (7th Cir. 2002)(a plaintiff may demonstrate that another employee is similarly situated to him by "show[ing] that there is someone who is directly comparable to [him] in all material respects."). Herein, Williams has failed to proffer any evidence with respect to whether he was similarly situated to Streb or Roman's other Regional Sales Directors. The record evidence actually demonstrates that Williams and Streb were not similarly situated but that Streb was substantially more experienced in Roman's industry than Williams.

untrue, and moreover, Williams alleges that Bryson was also highly critical of him regarding a simple commission dispute. (*Id.* at 7-8.) Williams therefore avers that herein Roman attempted to manipulate his last performance review in order to "cover up the RIF."[30] (*Id.* at 8.)

Williams also contends that Roman's decision to hire Streb immediately prior to his termination demonstrates pretext on the part of Roman. (Pl.'s Resp. at 8-9.) Thus, Williams asserts he received his last performance review in January of 2003, just a few days after Streb began work on January 6, 2003; therefore, Streb was in the "pipeline" long before Bryson gave Williams the lower performance rating. (*Id.*) Accordingly, Williams avers that Roman wanted Streb, a younger Regional Sales Director, in place before it implemented its RIF policy. (*Id.*)

With regard to pretext, Williams further asserts that Roman intentionally disregarded its own RIF policy when Bryson ignored the length of service criterion and compared Williams and Streb on the basis of performance and potential. (Pl.'s Resp. at 9.) Williams claims that when compared to Streb, he had more than three years of service with Roman and Streb was too new to have had a performance rating or to have established an objective track record. (*Id.*) Thus, according to Williams, the only thing that Bryson and Orloff could have used to compare to Streb's nonexistent rating was Williams's satisfactory one. (*Id.*) Moreover, Williams alleges that besides pretext, willfulness has also been established herein because he trained Streb, Streb had not made a sale to a new customer prior to the RIF, and Roman retained Streb, who was his much younger counterpart. (*Id.* at 10.) Therefore, Williams avers that Bryson "hinged his RIF decision on the 'good business development' which he saw . . . coming from Streb" which was nothing more than a subjective

---

[30]Williams asserts that, beginning at the end of 2001, Orloff instructed managers to give employees lower performance ratings. (Pl.'s Resp. at 8.)

belief on his part and, consequently, demonstrates pretext herein. (*Id.*)

Initially, it bears noting that Williams has established the first three elements of his *prima facie* case. Specifically, Williams is a member of the protected class because he was 65 years old at the time of his termination (Def.'s LR56.1(a)(3) St. ¶ 24) and, moreover, he was satisfactorily performing his job duties as shown by the fact that he received performance ratings which fell within the SATISFACTORY but Needs Improvement" category. *Krchnavy,* 294 F.3d at 875. (*See* Def.'s Ex. 5, 2000 Managers Confidential Employee Appraisal, 2001 Year End Confidential Appraisal, & Year End Confidential Appraisal, signed by Bryson on 1/3/03.) Moreover, with respect to Williams's July of 2002 performance review, because his performance rating is not reflected in the record, the Court has calculated this rating and finds that it also falls within this same category. (*See* Pl.'s Ex. A, 2002 Employees Bi-Annual Confidential Appraisal.)

Next, with regard to the fourth element of the *prima facie* case, Williams must show that "his responsibilities were absorbed by employees not in the protected class." *Ritter,* 231 F.3d at 1042; *Michas,* 209 F.3d at 693 ("because the fired employee's duties are absorbed by other workers and the employee was 'replaced, not eliminated,' [the Seventh Circuit] only require[s] that a plaintiff demonstrate that his duties were absorbed by employees who were not members of the protected class."). Herein, prior to his termination, Williams's was the Regional Sales Director who was responsible for Roman's geographical sales Region IV. (Def.'s LR56.1(a)(3) St. ¶ 24.) After Williams's termination, Sadowski, who was 37 years old, and Holmen, who was 46 years old, absorbed Williams's responsibilities for Region IV.[31] (Def.'s 9/30/05 Supp. Brief at 1, Def.'s

---

[31]After Williams's was terminated, Roman reduced the number of its geographical sales regions from five to four. (Pl.'s 9/29/05 Supp. Brief, Ex. 1, Def.'s Answer to Pl.'s Interrogatory

(continued...)

21

LR56.1(a)(3) St. ¶ 24.) Thus, initially, Williams has demonstrated that Sadowski, an employee who was not a member of the protected class (i.e., forty years of age or older), absorbed a portion of his job responsibilities after his termination; namely, four of nine states in Region IV.[32]

Williams has also demonstrated that Holmen, a substantially younger employee, absorbed the balance of his job responsibilities; namely, the remaining five of nine states of Region IV.[33] (Def.'s 9/30/05 Supp. Brief at 1.) It bears noting that the Supreme Court has found that "an ADEA plaintiff who shows that someone 'substantially younger' was retained instead of the plaintiff need not prove that the replacement is outside the protected class." *Balderston v. Fairbanks Morse Engine Div. Of Coltec Indus.,* 328 F.3d 309, 321 (7th Cir. 2003)(*citing O'Connor v. Consol. Coin Caterers Corp.,* 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996))("[T]he fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class."); *see also Miller,* 168 F.3d at 313 ("The younger employees 'need not be outside the protected class, i.e., under the age of forty, . . . but they should be substantially – i.e., at least ten years – younger than the terminated employee."); *Cianci v. Pettibone Corp.,* 152 F.3d 723, 727 (7th Cir. 1998)(The Seventh Circuit has "explained that 'substantially younger' requires a ten-year difference in age between the plaintiff and [his] replacement and that an age disparity of less than ten years is presumptively

---

[31](...continued)
No. 7.)

[32]Region IV consisted of the following states: Arkansas, Colorado, Kansas, Louisiana, Missouri, Nebraska, New Mexico, Oklahoma, and Texas. (Def.'s 9/30/05 Supp. Brief at 1.) After Williams's termination, Sadowski assumed responsibility for Colorado, Kansas, Missouri and Nebraska. (*Id.*)

[33]Holmen assumed responsibility for Arkansas, Louisiana, Oklahoma, New Mexico and Texas. (Def.'s 9/30/05 Supp. Brief at 1.)

insubstantial unless the plaintiff 'directs the court to evidence that [his] employer considered [his] age to be significant.'")(*quoting Hartley v. Wisconsin Bell, Inc.,* 124 F.3d 887, 893 (7th Cir. 1997)). Herein, Holmen, who was 46 years old, was substantially younger than Williams because he was nineteen years younger than Williams at the time of Williams's termination. (Def.'s LR56.1(a)(3) St. ¶ 24.) The Court therefore finds that Williams has established a *prima facie* case of age discrimination herein.

Next, Williams has produced no legitimate evidence demonstrating that Roman's reasons for retaining Sadowski and Holmen rather than Williams are a pretext for age discrimination.[34] (*See* Pl.'s 11/4/05 Sec. Supp. Brief at 2-3.) Rather, Roman chose to retain Sadowski because she was its highest rated Regional Sales Director who had about fourteen years of experience with Roman. (Def.'s 9/30/05 Supp. Brief at 1-2, Def.'s LR56.1(a)(3) St. ¶ 24.) Moreover, Roman chose to retain Holmen because he was Roman's third highest rated Regional Sales Director who had about thirteen years of experience with Roman and about eighteen years of experience in Roman's industry. (Def.'s 9/30/05 Supp. Brief at 1, Def.'s LR56.1(a)(3) St. ¶ 24, Def.'s Ex. 2, Position Statement of Respondent, Roman, Inc. at 2.) Thus, Sadowski and Holmen met Roman's RIF criteria (i.e., performance rating and length of service with Roman) because they both had higher performance ratings and greater lengths of service than Williams. Accordingly, Williams is unable to establish that Roman's retention of Sadowski and Holmen was a pretext for age discrimination.[35]

---

[34]There is no evidence in the record to suggest that Williams's January of 2003 performance review was "contrived" and, moreover, there is no evidence to suggest that Roman deviated from its own RIF criteria by considering Holmen's combined, total length of employment service with Roman. (*See* Pl.'s Sec. Supp. Brief at 2-3.)

[35]It bears noting that Lindgren was Roman's second highest rated Regional Sales Director who had about eight years of work experience with Roman and about fourteen years of work experience in Roman's industry. (Def.'s 9/30/05 Supp. Brief at 2, Def.'s LR56.1(a)(3) St. ¶ 24,

(continued...)

Williams is also unable to show that Roman's retention of Streb, a substantially younger employee who was 47 years old, was a pretext for discriminating against Williams on the basis of his age. Initially, it bears repeating that when Bryson made his RIF recommendation, he ignored the length of service criterion and compared Williams and Streb on the basis of performance and potential. (Def.'s Mem. at 6.) Based on this comparison, Bryson chose to retain Streb rather than Williams because Streb had extensive experience in Roman's industry and the industry connections needed to rebuild Roman's sales. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶¶ 31, 61, Bryson Aff. ¶ 8.) More importantly, Bryson chose to retain Streb because in his first three months of employment with Roman, Streb demonstrated to Bryson that he had the potential to increase sales because he initiated contact with one new company called Tractor Supply, opened a new account named Fred's, and expanded one of Roman's existing accounts with Eckerd by identifying the corporate (national) buyer. (Bryson Aff. ¶ 11(a)-(c).) Bryson therefore believed, based on Streb's demonstrated potential, that Roman could expect business from a large new account and new or expanded business from other accounts.[36] (Id.)

It bears noting too that Orloff also considered Streb's performance in terms of "initiative, drive, follow up, aggressiveness and use of . . . contacts" and believed that Streb "fit the bill" in "talent and experience" which Roman needed in order to turn sales around and move the company forward. (Orloff Aff. ¶ 12.)

---

[35](...continued)
Def.'s Ex. 2, Position Statement of Respondent, Roman, Inc. at 2.) Thus, Lindgren was not included in the RIF because she had a higher performance rating and greater length of service with Roman than Williams. Furthermore, Lindgren cannot be viewed as being substantially younger than Williams. *See e.g., Cianci,* 152 F.3d at 727.

[36]These accounts generated a total of over one million in sales for Roman in 2003 and 2004. (Bryson Aff. ¶ 11(a)-(c).)

Williams, on the other hand, was selected for inclusion in the 2003 RIF because he was Roman's lowest rated Regional Sales Director and his performance had failed to improve during his three and one-half years of employment with Roman. (Bryson Aff. ¶ 7.) Importantly, as indicated by his performance reviews, Williams had never performed well in the areas that Roman needed for rebuilding sales in 2003 and beyond which included "initiative, new account and sales generation, and expansion of existing accounts." (Bryson Aff. ¶ 6, 11(d), 12., Def.'s Ex. 5, 2000 Managers Confidential Employee Appraisal, 2001 Year End Confidential Appraisal, & Year End Confidential Appraisal, signed by Bryson on 1/3/03, Pl.'s Ex. A, 2002 Employees Bi-Annual Confidential Appraisal.) Williams's performance reviews thus consistently articulated Roman's problems with his job performance[37] and, moreover, Williams agreed that, in some instances, Bryson had some

---

[37]Williams had four performance reviews while he worked at Roman. On his first performance review which was for the year 2000, Bryson stated *inter alia*: "Larry needs to show more initiative and held drive the business vs. just maintaining the business. He needs to be in the field more, and develop[] more customer relationships." (Def.'s Ex. 5, 2000 Managers Confidential Employee Appraisal.) On Williams's second performance review for the year 2001, Bryson stated *inter alia*: "Larry needs to show more initiative in managing/building his existing business and in searching out and developing new business . . . [He] need[s] . . . to '[d]rive' his region[']s business, seek out new propect[ive] accounts, and then hold people accountable to get the business." (*Id.*, 2001 Year End Confidential Appraisal.) On his third performance review in July of 2002, Bryson noted *inter alia* that "Larry must show more initiative and creativity in building his business. He must proactively search out new business opportunities and encourage his rep[resentatives] to do the same. He must lead by example, including [taking] the time . . . to maximize his business." (Pl.'s Ex. A, 2002 Employees Bi-Annual Confidential Appraisal.) On Williams's fourth and final performance review in January of 2003, Bryson *inter alia* stated: "Larry is having a difficult time implementing the tough direction with his rep[resentatives] that is necessary to turn sales around . . . [He] must improve his performance in his current position by taking control of issues and demonstrating leadership. If this does not happen the field sales portion of his region will continue to struggle and alternatives for building this business will need to be evaluated." (Def.'s Ex. 5, Year End Confidential Appraisal, signed by Bryson on 1/3/03.) It bears noting too that Williams discussed each of these performance reviews with Bryson and was aware of Bryson's concerns regarding his performance. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶¶ 40, 44, 47, 53, 55.)

legitimate concerns about his performance.[38] (Williams Dep. at 37:20-38:7.) Furthermore, and very importantly, Williams was successful in opening only one new account of any significance during his tenure at Roman. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶ 36.)

The Court finds that there is no evidence in the record whatsoever to suggest that Roman's articulated reasons for retaining Streb rather than Williams were a pretext for discriminating against Williams on the basis of his age. Rather, when comparing Streb to Williams, Williams had shown, during his three and one-half years of employment with Roman, that he was not capable of meeting Roman's changed performance expectations given the fact that Roman needed to rebuild its sales and change the course of its business. Moreover, Williams did not have the requisite experience in Roman's industry that would render him as effective as Streb, especially in light of Roman's changed circumstances; namely, its need to rebuild its business. Thus, it is important to understand that the change in Roman's business circumstances; namely, it's decline in sales revenues, between the time Williams began working for Roman in 1999 and the time it underwent its RIF in 2003 was what ultimately drove Roman's decision to terminate Williams, who was well-thought of by both his superiors and subordinates, but who unfortunately was no longer the most appropriate fit for Roman given Roman's need to rebuild and change the course of its business. The record clearly demonstrates that both Bryson and Orloff believed that Streb was better suited to meet Roman's changed business circumstances; therefore, Roman's retention of Streb was strictly based on legitimate, business necessity. *See e.g., Michas,* 209 F.3d at 695 (a plaintiff must present evidence from which a court can infer that the employer "did not, at the time of his discharge, honestly

---

[38]Thus, while Williams did not entirely agree with Bryson's criticisms regarding his performance, he testified that Bryson's criticisms were not unreasonable and Bryson was not unreasonable in terms of what he wanted from him. (Pl.'s Resp. to Def.'s LR56.1(a)(3) St. ¶ 56, Williams Dep. at 35:8-35:15.)

believe the reason they gave for firing him"); *see also Wolf,* 77 F.3d at 919 (same). Accordingly, because Williams has failed to show that Roman's reasons for terminating him were for any reason other than business necessity, he has failed to establish pretext herein.[39] *See e.g., Testerman,* 98 F.3d at 303-04 (a plaintiff must establish that an improper motive "tipped the balance" in favor of his discharge). The Court therefore finds that Williams's age discrimination claim cannot stand herein because he has failed to demonstrate that Roman's reasons for terminating him were a pretext for age discrimination.[40] Accordingly, Williams has failed to demonstrate that his age was the "but for" cause of his termination. *See e.g., Taylor,* 69 F.3d at 779; *Gehring,* 43 F.3d at 344.

## **CONCLUSION**[41]

Based on the foregoing, Roman's motion for summary judgment is granted and the cause is dismissed with prejudice.

---

[39]The Court finds Williams's claims that Roman attempted to manipulate his last performance review in order to "cover up the RIF" and that Roman wanted Streb, a younger Regional Sales Director, in place before it implemented its RIF policy unavailing because there is no evidence in the record to support these claims. (*See* Pl.'s Resp. at 6-10.) Moreover, Williams's assertion that Roman's deviation from its own RIF policy was a pretext for discriminating against him on the basis of his age is unavailing because, as discussed, Roman has articulated legitimate, non-discriminatory reasons for deviating from its RIF criterion (i.e., length of service). (*Id.* at 9-10.) Accordingly, those cases cited by Williams in support of this proposition are unavailing. (*Id.* at 10.)

[40]Williams has also failed to establish that Roman's reasons for employing its 2003 RIF were a pretext for discriminating against him on the basis of his age. Rather, as demonstrated by the evidence in the record, Roman suffered a decline in sales in the years 1999 through 2003 and responded by cutting expenses which included payroll expenses. (Def.'s LR56.1(a)(3) St. ¶ 23-25.) *See e.g., Paluck,* 221 F.3d at 1012 ("Pretext may be shown by demonstrating that the reduction in force was an excuse to get rid of workers belonging to the protected group."). Accordingly, there is no evidence in the record to disprove that Roman undertook its RIF in order to cut costs.

[41]In view of the Court's ruling herein, it is deemed unnecessary to consider Williams's and Roman's other arguments raised herein.

ENTER:

IAN H. LEVIN
United States Magistrate Judge

Dated:  November 10, 2005